IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

**JENNIFER WOMAC v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Meigs County**
**No. 2009-CR-55A     Jeffrey Wicks, Judge**

_____

**No. E2017-00660-CCA-R3-PC**
_____

The petitioner, Jennifer Womac, appeals the denial of her petition for post-conviction relief, which petition challenged her 2012 guilty-pleaded conviction of second degree murder. In this appeal, the petitioner contends that her guilty plea was not knowingly and voluntarily entered, pointing to deficiencies in the plea colloquy, and that she was denied the effective assistance of counsel. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jonathan S. Edwards, Oak Ridge, Tennessee, for the appellant, Jennifer Womac.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Russell Johnson, District Attorney General; and Lauren Bennett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In 2009, the Meigs County Grand Jury charged the petitioner with one count of first degree premeditated murder for her role in the death of her father, Grady Nichols, Jr. In February 2010, the State filed notice pursuant to Tennessee Rule of Criminal Procedure 12.3 that it intended to seek the death penalty, specifically alleging that the petitioner employed co-defendant "James L. Landers to commit the murder for remuneration or the promise of remuneration."

On February 2, 2012, the petitioner executed a written waiver of her right to trial by jury and a request that the trial court accept her plea of guilty to the lesser

included offense of second degree murder. Pursuant to a plea agreement with the State, the petitioner received a Range II sentence of 40 years' incarceration. During the guilty plea submission hearing, the State provided the following summary of the circumstances of the offense:

> [I]n Meigs County, during the days leading up to September 19th of 2009, [the petitioner] approached James Landers and solicited and inquired of him, of his willingness to kill Grady Nichols, Jr., [the petitioner's] father.
>
> They did in fact reach an agreement for the killing of Mr. Grady Nichols, Jr., and Mr. Landers did in fact shoot and kill him. Intentionally causing his death on September the 19th of 2009 in Meigs County.

On January 28, 2013, the petitioner filed a timely petition for post-conviction relief, which petition alleged that the petitioner was deprived of the effective assistance of counsel and that her conviction was based upon the use of a coerced confession. The post-conviction court appointed counsel on November 7, 2013. Original post-conviction counsel moved to withdraw in December 2014, and the post-conviction court appointed current post-conviction counsel to represent the petitioner on December 19, 2014.

On September 8, 2016, the petitioner filed an amended petition for post-conviction relief and a memorandum of law in support of her claims for post-conviction relief. The petitioner argued that her guilty plea was not knowingly and voluntarily entered because she was deprived of the effective assistance of counsel and because the trial court failed to follow the requirements of Tennessee Rule of Criminal Procedure 11 and *State v. Mackey*, 553 S.W.2d 337 (Tenn. 1977), when accepting the petitioner's guilty plea. Specifically, the petitioner claimed that lead trial counsel "made threats and derogatory comments" to her in the months leading up to her guilty plea, that lead trial counsel improperly recruited the petitioner's mother to pressure her into accepting the plea offer, that lead trial counsel failed to adequately explain the terms of the plea offer, and that lead trial counsel intimidated and coerced the petitioner into pleading guilty. The petitioner claimed that the trial court failed to ensure that her guilty plea was knowingly and voluntarily entered by failing to follow the Rule 11 colloquy exactly.

At the January 13, 2017 evidentiary hearing, the petitioner testified that she pleaded guilty only because she "felt like [she] didn't have a choice." She claimed, "[M]y attorney . . . told me that if I took it to trial that I would get the death penalty, and that at the very least I would get life without parole." She said that her counsel also

"described in vivid detail what death row was like." She claimed that her trial counsel had called her "a whore once" and "a liar" when she tried to tell him something her previous counsel had told her. The petitioner said that counsel "never had . . . a nice word to say to" her and that he appeared "repulsed by being in the same room with" her. She claimed, "[H]e told me that my children hated me, that my family hated me, and that they would never want anything to do with me. And that the only reason my mother cared anything about me was because I shared D.N.A. with her." According to the petitioner, she chose to plead guilty instead of going to trial because she did not think that counsel "would have been for" her or that "he would have represented [her] the way [she] should have been represented." When confronted with the fact that the petitioner stated during the plea colloquy that she was satisfied with the representation offered by her attorneys, the petitioner said,

> To be honest I don't remember saying that but I know the record shows that and I know that I said that. And that whole day was just kind of like a fog, like I was on auto-pilot. I don't even remember saying that – most of what happened that day I don't even remember.

The petitioner claimed that lead trial counsel "was very happy about" the State's offer of a 40-year sentence in exchange for a plea of guilty to second degree murder. She insisted that she was less than thrilled with the offer because she "would rather to just have life than the 40 years because it would be more human[e] to [her] than for [her] to try to find somewhere to go at 76." She said that, at that point, counsel told her that that was not "his problem or the State's problem." The petitioner testified that lead trial counsel told her that the plea offer would not "be on the table forever" and that she "needed to act fast."

The petitioner said that she did not read the plea documents and that neither lead trial counsel nor associate trial counsel read the documents to her. She said that neither attorney discussed the documents with her, saying that "the only thing that was discussed . . . was that in order for [her] to take 40 years at second degree, that they had to have [her] permission." She insisted that no one told her about her right to appeal her conviction should she be convicted at trial. She also claimed that neither her attorneys nor the trial court inquired into the voluntariness of her plea. Had they done so, she claimed, she "would have told them no" because "it was not voluntary."

During cross-examination, the petitioner acknowledged that she had graduated high school and had no difficulty reading and writing. She said that the trial court had appointed two attorneys to represent her and that both attorneys had met with her on more than five occasions prior to the entry of her plea. The petitioner admitted

-3-

that the attorneys discussed the charged offense and the potential punishments for that offense. She denied speaking to either attorney about any possible defenses in the case. She could not recall whether her attorneys had discussed "all the evidence" with her but stated that "they had went over the recording" wherein her co-defendant had worn a recording device while discussing the details of the victim's murder with the petitioner. The petitioner said that she was aware that the co-defendant had confessed to the victim's murder and that he had told investigators that the petitioner "actually . . . had planned for him . . . to kill" the victim and "had promised him 30 percent of [the] take." The petitioner could not recall whether her attorneys had told her that the co-defendant told investigators that the petitioner told him where and when to find the victim and that the petitioner told him she would inherit one million dollars from the victim's estate.

The petitioner acknowledged that her attorneys provided her with "a big stack of papers, which was discovery," and asked her "to read through ever[y] page" and mark any inconsistencies. She could not recall, however, whether the discovery materials included the information that she had dropped the co-defendant off to shoot the victim and had picked him up after he completed the job or that she had disposed of the murder weapon. The petitioner admitted that her attorneys went over the transcript of the audio recording of her conversation with the co-defendant but claimed that she could not recall hearing that portion of the recording where she told the co-defendant that she would pay any amount necessary to create a fake alibi for the co-defendant. The petitioner insisted that she had reviewed all the discovery materials provided to her and admitted that the contents of those materials would have been fresh in her mind when she entered her plea.

The petitioner identified her signature on the plea documents filed on February 2, 2012, but she said that she did not "recall it being read to" her and that she did not "recall reading it" before signing it. She agreed, however, that she typically did not "sign random things." She said that it was possible that she had read the documents or that they had been read to her but that she did not recall their contents. Later, she claimed she had no recollection of ever having seen the plea documents. She claimed that although she recalled coming to court on the day she entered her plea and having a discussion with her attorneys before pleading guilty, she could not recall the substance of their conversation. Of the plea process, the petitioner said that she "kn[e]w there was a judge" and that he asked her questions, but she had no specific recollection of the questions or her answers.

The petitioner said that she understood that by pleading guilty to second degree murder, she "was going to prison for 40 years." The petitioner stated that she knew that the State was seeking the death penalty in her case. The petitioner conceded that the transcript of the guilty plea submission hearing established that the trial court informed her of her right to a jury trial, compulsory process, the right to confront the

witnesses against her, and the privilege against self-incrimination and that she had agreed to the State's stipulation of facts, but she insisted that she had no independent recollection of the colloquy.

The petitioner insisted that she did not plead guilty because of the weight of the evidence against her, explaining, "I was thinking that my attorney told me that I needed to take that or I was going to get the death penalty."

During redirect-examination, the petitioner said that she could not recall whether she was sworn prior to entering her plea, whether the trial court had inquired of her education level, whether there was anything in the plea documents she did not understand, or whether she realized that by signing the plea documents she was certifying that she had read them. She said that lead trial counsel often indicated to her that he did not believe things she told him about the case, saying, "He just called me a liar all the time. And uh, yeah, he'd just call me a liar." She insisted that her plea was not freely and voluntarily entered because she "was scared of the death penalty."

Associate trial counsel testified that he was appointed second chair after the State filed notice of its intent to seek the death penalty. Lead trial counsel was appointed after the attorney originally appointed as first chair in the petitioner's case took a position as an assistant district attorney. Associate counsel recalled that he went to most court appearances and that he and lead counsel primarily visited the petitioner together, although he remembered two occasions when lead trial counsel had visited the petitioner without him. Lead counsel handled most of the correspondence.

Associate trial counsel testified that he and lead trial counsel "discussed at length" with the petitioner "the particulars . . . that are required to be proved by the State." He said they also discussed with the petitioner the three possible punishments for a conviction of first degree murder and "any possible potential punishment, range of punishments that might come if there were a finding of guilt for a lesser included offense and what went with that." They also told the petitioner "the difference between sentencing for a capital murder case . . . as opposed to say second degree murder . . . and all the ranges that came with those and on down the line." He said that they had lengthy discussions during which they explained release eligibility percentages.

Associate trial counsel testified that on the day of the petitioner's plea, he and lead counsel "had some further discussions" with the petitioner "which were basically a reiteration of the same things that we had previously discussed in January when she had advised that she was willing to take the plea agreement with the State." He said that he specifically recalled both attorneys' going "over the same things as far as the rights and things like that again. We went over range of punishment." He recalled that in

the months leading up to the plea, the petitioner had asked a lot of questions about sentence length and release eligibility. Associate counsel recalled that he and lead counsel told the petitioner about her potential to earn up to a 15 percent reduction in her sentence but warned that when she calculated the number of years she would have to serve, she "better go ahead and just do them year for year as opposed to trying to give any sort of credit because" it was better to think about "the worst case scenario" before accepting the plea. Associate counsel said that he did not "remember her being particularly shaken" on the day she entered the plea.

Associate trial counsel acknowledged that the trial court did not place the petitioner under oath before accepting her plea and that the court did not follow exactly the requirements of Tennessee Rule of Criminal Procedure 11.

Associate trial counsel testified that he and lead trial counsel reviewed the discovery materials with the petitioner and that they focused particularly on "some of the tape recordings" because those recordings were the "cause for concern" in his opinion. He said that he had "a concern at that particular time about the likelihood of success at suppressing those" recordings and, if those recordings were deemed admissible, "how it would impact not just trial strategy but also the [e]ffect it might have on a potential jury." Of particular concern for trial counsel "was some of the recording[s] that had been made of [the petitioner] that she was not aware of at the time." He said that he "talked at length" about "[t]he nitty gritty about the content of those recordings" with the petitioner and warned her about their potentially damaging impact.

Associate trial counsel said that the petitioner never indicated that she did not understand what was happening in her case. He said that it was his practice to "take it very slow" with all of his clients when explaining the law and the criminal trial process. Associate counsel said that he and lead trial counsel had repeatedly discussed with the petitioner the difference between a Range I and a Range II sentence and that she was pleading outside of her range. He said that the plea documents were discussed with the petitioner, explaining that it was his practice to read the plea documents "to the clients" because he "wanted them to quite frankly to always know that [he] read everything to them verbatim as far as any plea papers." He added, "[T]hese matters were gone over with [the petitioner], in fact, there was a different pack of materials . . . that were . . . gone over with her not just on the day of and the ones that were ultimately entered with the court but had been discussed with her previously." He said that "there wasn't anything that cause[d]" him "to question whether she understood what she was doing at that time, based on our discussions."

Associate trial counsel said that he did not recall any meetings wherein lead trial counsel behaved unprofessionally toward the petitioner. He said that neither he nor

lead trial counsel threatened the petitioner or forced her to accept the plea offer. He stated that they had frank discussions with the petitioner about "the nature of the facts that . . . may have been presented at trial," but "nothing that would have indicated . . . there was any effort to overcome her will or voluntariness of anything." He added, "And quite frankly, as counsel for any defendant, I wouldn't have gone along with it myself if I thought that were the case." He said that he would not have allowed the plea submission hearing to proceed if he had believed the petitioner's plea was not knowing and voluntary.

Lead trial counsel testified that he was appointed first chair in the petitioner's case on July 6, 2011, and that he met with the petitioner nine times between the day he was appointed and the day she pleaded guilty. He said that immediately after his appointment, he met with associate trial counsel to review the discovery materials. He then met with the petitioner at the jail and "took a detailed history, a personal history of her, family members, medical histories, those kinds of things." He obtained medical records for the petitioner and the co-defendant, who "had attempted suicide." He contacted the Chattanooga attorney who opened the victim's estate. Lead counsel obtained funds to hire a mitigation specialist from Nashville, a general investigator from Nashville, and a former FBI agent to assist in examining the financial records in this case.

Lead trial counsel said that he "would have explained" the discovery materials to the petitioner and "would have gone through the records and explained to her the different reports." He said that he would have played the audio recordings for the petitioner on his laptop computer. With regard to the recorded conversation between the petitioner and the co-defendant, lead trial counsel said that he would have found "every statement she made in that recording" that he believed to be incriminating and would have asked the petitioner specifically to explain those statements. He recalled that "this statement was what was the sticking point for several meetings, her inability to be able to explain its contents." He said that his purpose in focusing on the statement was not to place the petitioner under duress but to prepare her for trial.

Lead counsel testified that as soon as he was up to speed on the case, he began plea negotiations with the State. He recalled that the initial offer required the petitioner to plead guilty to first degree murder in exchange for a life sentence. Two weeks later, the State presented an offer that required the petitioner to plead guilty to second degree murder in exchange for a Range II sentence of 40 years. He said that he discussed the latter offer with the petitioner on three separate occasions before she entered her plea. He said that he told the petitioner that the agreement called for an out-of-range sentence and explained to her the difference between a Range I sentence and a Range II sentence. He also told her "that she would have to consent and agree to receive a 40 year sentence for us to plead her guilty to second degree murder." He added, "And

so she knew the ranges, she knew what she faced if she went to trial. What was pressing for us obviously was the death penalty notice."

Lead trial counsel testified that "as our representation of her progressed, she conveyed to us several times about not wanting a trial." He said that he had "several documents" establishing that he had "set forth her options" for obtaining a plea agreement. He said that he discussed the elements of the charged offense with the petitioner as well as "the bifurcated nature of a death penalty trial" "early on" in the case. He said that he would have revisited those issues "when she decided to plead." He said that he "would have read the paperwork to her" and noted that the petitioner "actually signed two plea agreements," one on the day of her plea and one on January 13, 2012, when he and associate trial counsel met with the petitioner at the jail. He said that he "would not have read it verbatim" to the petitioner because she "could read or write, she was intelligent." He testified that the petitioner "would have had plenty of time" to read the plea paperwork and to ask him any questions about it during the January meeting. Lead counsel said that he repeated the entire process on the day the petitioner entered her plea. When asked whether the petitioner gave any indication that she did not understand the plea or its implications, lead counsel responded, "Absolutely not, she understood what she was doing that day. She was competent on what she was doing that day." Lead counsel recalled that following the entry of the petitioner's plea, the mitigation specialist, who "had spent some time with" the petitioner after the plea agreement was signed but before the trial court started the plea hearing, wrote counsel a letter wherein she indicated that the petitioner was "confident in her decisions." He said that based on this letter and the petitioner's behavior on the day of her plea, he believed that pleading guilty "was something that she wanted to do, she wanted to get it behind her."

Lead trial counsel vehemently denied coercing the petitioner to plead guilty, saying that the petitioner's pleading guilty would have had no benefit for him. He acknowledged having had several frank conversations with the petitioner "because she could not provide satisfactory answers to the things that she said in that 45 minute tape with" the co-defendant. He said that the petitioner was evasive when they discussed the recorded conversation, often claiming that she did not even remember it. Lead trial counsel stated that he wanted the petitioner to be able to answer "the hard questions" should she be called to testify at trial.

He also acknowledged that he discussed with the petitioner in great detail the reality of life on death row. Lead counsel said that he felt that it was important that the petitioner understand the "quality of life" on death row because "it's different than if you're" not on death row. He added that he believed it was "ineffective if you don't tell the defendant what they're . . . potentially looking at and their quality of life if they are in that situation." He recalled that the petitioner expressed concern about being released

-8-

from prison when she was in her seventies, so the mitigation specialist went to the prison to interview employees to determine the answers to the petitioner's questions. She then wrote a three-page letter to the petitioner that "answered those questions as best she could for her." He also recalled that he asked the district attorney to hold the plea offer open while the petitioner considered these issues.

Lead counsel described the petitioner's demeanor on the day of the plea submission hearing as "calm as a cucumber" and said that if he believed the petitioner did not understand the terms of the plea agreement and the rights she was waiving, he "would have stopped the proceeding."

During cross-examination, lead trial counsel acknowledged having had a heated discussion with the petitioner on November 8, 2011, explaining that "that was due to" the petitioner's "inability if you will, to explain to us her statements in that 45 minute tape with" the co-defendant. He added that "after those heated conversations we had a lot of constructive conversations with one another about how to end this case and bring it to a conclusion." Lead counsel said that he encouraged the petitioner to accept the plea offer "because of the overwhelming evidence that they had against her," adding, "I felt like the State had evidence of first degree murder and that it would be fairly easy to convict her of first degree murder." He said that the recorded conversation between the petitioner and the co-defendant was "worse than a confession to law enforcement." He added, "All the State would have to do is hit play [on the recordings] to convict her of first degree murder." Given this overwhelming evidence, he told her that "[i]t would be very difficult to refute what's on that tape" if she took the stand. Lead counsel said that he "told her that the chance of her being convicted and given the death penalty was substantial."

Lead trial counsel testified that after obtaining the petitioner's permission to do so, he spoke to the petitioner's mother about the case. He told her the poor odds of the petitioner's being acquitted and that he thought the petitioner should accept the plea offer. He said that he did not "recall telling [the petitioner's mother] you need to convince your daughter to take this offer," but he did not "necessarily dispute that either." He stated that he wanted the petitioner's mother to help her "make good decisions," explaining that in a death penalty case the goal was "trying to save someone's life."

At the conclusion of the hearing, the post-conviction court took the matter under advisement.

In the written order denying post-conviction relief, the post-conviction court observed that the petitioner "appeared to have a good memory to any fact or circumstance that tended to support her argument that her plea was not knowing and

voluntary or that her trial counsel was ineffective. However, her favorite answer to any question that was incriminating or did not support her argument was 'don't recall.'" The court added that "[b]ased upon the court's observations of [the] [p]etitioner's demeanor and her answers to the questions asked of her, the court does not find [the] [p]etitioner's testimony to be the least bit credible." The post-conviction court accredited the testimony of associate trial counsel that he "had lengthy discussions with" the petitioner regarding "her constitutional rights, the elements of proof required and the range of punishment for both first degree murder and second degree murder, lesser included offenses, and the difference between a Range I and Range II offender." The court accredited the testimony of lead trial counsel that he had discussed these same things with the petitioner. With regard to the petitioner's claim that the trial court failed to follow exactly the Rule 11 colloquy, the post-conviction court found that the petitioner's allegation "is not constitutionally based" and "is not cognizable under the Post-Conviction Procedure Act." As to the petitioner's claim that her guilty plea was the product of ineffective assistance of counsel, the post-conviction court specifically found the testimony offered by lead trial counsel and associate trial counsel "to be substantially more credible than [the] [p]etitioner's" and that the petitioner had "failed to prove that [lead trial counsel] made any threats to her, blatant or otherwise, which would force her to accept the guilty plea against her will."

In this timely appeal, the petitioner reiterates her claims that she was deprived of the effective assistance of counsel and that, because the trial court failed to satisfy the Rule 11 requirements during her plea colloquy, her guilty plea was not knowingly and voluntarily entered. The State asserts that the post-conviction court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via

facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Apart from whether a guilty plea is the product of ineffective assistance of counsel, it is invalid if otherwise made unknowingly or involuntarily. "Whether a plea was knowing and voluntary is an issue of constitutional dimension because '[t]he due process provision of the federal constitution requires that pleas of guilty be knowing and voluntary.'" *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2000) (quoting *Johnson v. State*, 834 S.W.2d 922, 923 (Tenn. 1992)). A plea "may not be the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Wilson*, 31 S.W.3d at 195 (quoting *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969)); *see also State v. Mellon*, 118 S.W.3d 340, 345 (Tenn. 2003) (citing *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993)).

Both a claim of ineffective assistance of counsel and a claim of involuntary guilty plea are mixed questions of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo,

and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the denial of relief in this case.

*Rule 11*

Without question, the trial court in this case did not follow exactly the litany required by Tennessee Rule of Criminal Procedure 11, which provides:

(1) ADVISING AND QUESTIONING THE DEFENDANT. - Before accepting a guilty or nolo contendere plea, the court shall address the defendant personally in open court and inform the defendant of, and determine that he or she understands, the following:
(A) The nature of the charge to which the plea is offered;
(B) the maximum possible penalty and any mandatory minimum penalty;
(C) if the defendant is not represented by an attorney, the right to be represented by counsel--and if necessary have the court appoint counsel--at trial and every other stage of the proceeding;
(D) the right to plead not guilty or, having already so pleaded, to persist in that plea;
(E) the right to a jury trial;
(F) the right to confront and cross-examine adverse witnesses;
(G) the right to be protected from compelled self-incrimination;
(H) if the defendant pleads guilty or nolo contendere, the defendant waives the right to a trial and there will not be a further trial of any kind except as to sentence;
(I) if the defendant pleads guilty or nolo contendere, the court may ask the defendant questions about the offence to which he or she has pleaded. If the defendant answers these questions under oath, on the record, and in the presence of counsel, the answers may later be used against the defendant in a prosecution for perjury or aggravated perjury;
(J) if the defendant pleads guilty or nolo contendere, it may have an effect upon the defendant's immigration or naturalization status, and, if the defendant is represented by

-12-

counsel, the court shall determine that the defendant has been advised by counsel of the immigration consequences of a plea; and

(K) if the defendant pleads guilty or nolo contendere to an offense for which he or she will receive an additional sentence of community supervision for life, the fact that he or she will receive the additional sentence, and, if the defendant is represented by counsel, the court shall determine that the defendant has been advised by counsel of the community supervision for life sentence and its consequences.

(2) INSURING THAT PLEA IS VOLUNTARY. - Before accepting a plea of guilty or nolo contendere, the court shall address the defendant personally in open court and determine that the plea is voluntary and is not the result of force, threats, or promises (other than promises in a plea agreement). The court shall also inquire whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the district attorney general and the defendant or the defendant's attorney.

(3) DETERMINING FACTUAL BASIS FOR PLEA. - Before entering judgment on a guilty plea, the court shall determine that there is a factual basis for the plea.

Tenn. R. Crim. P. 11. That being said, because "the additional processes for accepting a guilty plea that [*State v. Mackey*, 553 S.W.2d 337, 340 (Tenn. 1977)] and Rule 11 require are not necessarily constitutionally based," "an allegation that a trial court failed to follow . . . Rule 11 does not necessarily establish a cognizable post-conviction claim because post-conviction relief is only available to remedy an abridgement of a state or federal constitutional right." *Garcia v. State*, 425 S.W.3d 248, 263-64 (Tenn. 2013); *see also Johnson v. State*, 834 S.W.2d 922, 925 (Tenn. 1992) ("Whether the additional requirements of *Mackey* were met is not a constitutional issue and cannot be asserted collaterally."); *Rigger v. State*, 341 S.W.3d 299, 308 (Tenn. Crim. App. 2010) (recognizing that the procedures embodied in Rule 11 and *Mackey* are not constitutionally based and stating that "the claim of a lack of information about these rights is not, apart from a claim of involuntary and unknowing guilty plea, per se cognizable in a post-conviction proceeding"). Instead, "the three rights specified in *Boykin* form the constitutional touchstone for post-conviction relief purposes." *Rigger*, 341 S.W.3d at 308 (citing *Howell v. State*, 185 S.W.3d 319, 331 (Tenn. 2006)); *see also State v. Prince*, 781 S.W.2d 846, 853 (Tenn. 1989) ("*Mackey* mandated advice by the trial judge about the consequences of a guilty plea that went beyond the requirements of

*Boykin.* . . . That advice and any other requirement of *Mackey* in excess of *Boykin* is not based upon any constitutional provision, federal or state.").

Although it is the better practice for the trial court to substantially comply with Rule 11 because "a trial court's failure to comply with the non-constitutional provisions of Rule 11(c)(1)-(5) 'may contribute to the totality of the circumstances' that reflects an unknowing or unintelligent guilty plea," *Rigger*, 341 S.W.3d at 309 (quoting *Powers v. State*, 942 S.W.2d 551, 555 (Tenn. Crim. App. 1996)), "in many cases it may be possible to determine that a defendant entered a plea with knowledge and understanding of the nature of the plea offense, even when a trial court fails to conduct the Rule 11(c)(1) inquiry," *State v. Crowe*, 168 S.W.3d 731, 749 (Tenn. 2005). In this case, the accredited testimony of lead and associate trial counsel established that both attorneys repeatedly advised the petitioner of the nature of the charge, the weight of the State's evidence, the potential punishments, and the consequences of pleading guilty. Both attorneys testified that the petitioner was fully aware of the rights she was waiving by pleading guilty and that her plea was knowingly and voluntarily made. The petitioner signed the plea documents, which included a written waiver of her constitutional rights, on two separate occasions, and associate trial counsel testified that it was his regular practice to read plea documents to his clients. The transcript of the plea submission hearing establishes that the trial court informed the petitioner of her core constitutional rights, that the petitioner acknowledged having gone over the plea documents and terms of the plea agreement with her attorneys, and that she understood the consequences of pleading guilty. Under these circumstances, the petitioner has failed to establish by clear and convincing evidence any facts to support her claim that the trial court's failure to follow the Rule 11 litany in this case rendered her guilty plea unknowing and involuntary.

*Ineffective Assistance of Counsel*

The petitioner also contends that her guilty plea was unknowing and involuntary because it was the product of the ineffective assistance provided by her attorneys. Again, it is our view that the petitioner has failed to establish by clear and convincing evidence any support for her claim. Lead trial counsel admitted that he asked the petitioner hard questions about the case and that he informed the petitioner of the realities of life on death row, but he adamantly denied threatening the petitioner or coercing her to plead guilty. The post-conviction court declared the petitioner's testimony "not the least bit credible." The record belies the petitioner's testimony that counsel pressured her into accepting the plea agreement and pleading guilty in this case. Although the petitioner insisted that she pleaded guilty to avoid the death penalty, "[t]he entry of a plea of guilty to avoid a death sentence or risk greater punishment does not, standing alone, make the plea involuntary." *Parham v. State*, 885 S.W.2d 375, 381

(Tenn. Crim. App. 1994); *see also Bratton v. State*, 477 S.W.2d 754, 757 (Tenn. Crim. App. 1971) ("The law is also settled and is no longer open to question that a guilty plea is not rendered involuntary by the fact that the accused is faced with an election between a possible death sentence on a plea of not guilty and a lesser sentence upon a guilty plea."). No evidence supports a finding that the petitioner's plea was "the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats.'" *Wilson*, 31 S.W.3d at 195 (quoting *Boykin*, 395 U.S. at 242-43).

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE